**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

MICHAEL RICHARD KAYE,                           :
                                                :
        Plaintiff,                      :
                                                :
    -against-                               :
                                                :    Civil Action No. 16 Civ. 8558 (LGS)
CARTOON NETWORK, INC., TURNER                   :
BROADCAST SYSTEMS, INC., CABLE                  :
NEWS NETWORK, INC., TIME WARNER,                :    Hon. Lorna G. Schofield
INC., BOOM ENTERTAINMENT, INC.,                 :
REBECCA SUGAR, IAN JONES-                        :
QUARTEY, AND DOES 1-10, INCLUSIVE,              :
                                                :
        Defendants.                     :
                                                :
-------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE COMPLAINT

LOEB & LOEB LLP
Christian D. Carbone (CC-6502)
Frank D. D'Angelo (FD-0911)
345 Park Avenue
New York, New York 10154
(212) 407-4000

*Counsel for Defendants The Cartoon*
*Network, Inc., Turner Broadcasting System,*
*Inc., and Boom Entertainment, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

    A.    Plaintiff's "Amphoman" Comic Book Series ..........................................................3

    B.    The *Steven Universe* Animated Television Series ..................................................7

ARGUMENT ................................................................................................................10

I.    PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM FAILS BECAUSE THE WORKS ARE NOT SUBSTANTIALLY SIMILAR AS A MATTER OF LAW ..........................................................................................................................10

    A.    Claims of Substantial Similarity Can Be Dismissed at the Pleading Stage.................................................................................................................10

    B.    Alleged "Similarities" Involving Unprotectable Elements of the Works Are Insufficient to Survive a Motion to Dismiss..................................................12

    C.    There is No Substantial Similarity Between the Protectable Elements of "Amphoman" and *Steven Universe* as a Matter of Law .....................................16

        1.    The Plots and Sequences of Events Are Fundamentally Different..................................................................................................16

        2.    There Is No Protectable Similarity Between the Works' Characters ...............................................................................................17

        3.    The Works Have Vastly Different Themes .............................................18

        4.    The Settings and Pace of the Two Works Are Plainly Different .............20

        5.    The "Total Concept and Feel" of the Works Are Wholly Dissimilar ..............................................................................................20

    D.    Plaintiff's List of False "Similarities" in Exhibit B to the Complaint Fail in Both Legal Approach and Factual Execution..........................................22

CONCLUSION..............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Murdoch*,
   No. 10 Civ. 5613 (PAC) (JCF), 2011 U.S. Dist. LEXIS 79503
   (S.D.N.Y. July 14, 2011), *aff'd*, 502 F. App'x 107 (2d Cir. 2012)..................................11, 25

*Allen v. Scholastic Inc.*,
   739 F. Supp. 2d 642 (S.D.N.Y. 2011) ................................................................. 3, 11, 21, 22

*Arica Inst., Inc. v. Palmer*,
   970 F.2d 1067 (2d Cir. 1992)................................................................................................25

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) ................................................................................................16

*Canal+ Image UK v. Lutvak*,
   773 F. Supp. 2d 419 (S.D.N.Y. 2011)...................................................................................11

*Child v. Beame*,
   417 F. Supp. 1023 (S.D.N.Y. 1976)......................................................................................25

*Croak v. Saatchi & Saatchi, N. Am., Inc.*,
   174 F. Supp. 3d 829, 831 (S.D.N.Y. 2016) ....................................................................11, 25

*DiTocco v. Riordan*,
   815 F. Supp. 2d 655 (S.D.N.Y. 2011),
   *aff'd*, 496 F. App'x 126 (2d Cir. 2012) ........................................................................*passim*

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340 (1991) ..............................................................................................................12

*Flaherty v. Filardi*,
   388 F. Supp. 2d 274 (S.D.N.Y. 2005) ..................................................................................12

*Gal v. Viacom Int'l, Inc.*,
   403 F. Supp. 2d 294 (S.D.N.Y. 2005)...................................................................................11

*Gal v. Viacom Int'l, Inc.*,
   518 F. Supp. 2d 526 (S.D.N.Y. 2007) .............................................................................14, 16

*Green v. Lindsey*,
   885 F. Supp. 469 (S.D.N.Y. 1992),
   *aff'd*, 9 F.3d 1537 (2d Cir. 1993) .........................................................................................16

*Hallford v. Fox Entm't Grp., Inc.*,
No. 12 Civ. 1806 (WHP), 2013 U.S. Dist. LEXIS 19625
(S.D.N.Y. Feb. 13, 2013)............................................................................................3, 11

*Hogan v. DC Comics*,
48 F. Supp. 2d 298 (S.D.N.Y. 1999)...........................................................................15-16

*Kaplan v. Stock Mkt. Photo Agency, Inc.*,
133 F. Supp. 2d 317 (S.D.N.Y. 2001)..............................................................................13

*Lane v. Knowles-Carter*,
No. 14 Civ. 6798 (PAE), 2015 U.S. Dist. LEXIS 143794
(S.D.N.Y. Oct. 21, 2015).................................................................................................11

*Lewinson v. Henry Holt & Co., LLC*,
659 F. Supp. 2d 547 (S.D.N.Y. 2009)......................................................... 18, 21, 22, 24

*Mallery v. NBC Universal, Inc.*,
No. 07 Civ. 2250, 2007 U.S. Dist. LEXIS 88960 (S.D.N.Y. Dec. 3, 2007),
*aff'd*, 331 F. App'x 821 (2d Cir. 2009) .................................................... 13, 15, 23

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
602 F.3d 57 (2d Cir. 2010) .........................................................................*passim*

*Porto v. Guirgis*,
659 F. Supp. 2d 597 (S.D.N.Y. 2009) ......................................................................15, 19

*Psihoyos v. Nat'l Geographic Soc'y*,
409 F. Supp. 2d 268 (S.D.N.Y. 2005)..............................................................................22

*Reyher v. Children's Television Workshop*,
533 F.2d 87 (2d Cir. 1976) ..............................................................................................13

*Sheldon Abend Revocable Trust v. Spielberg*,
748 F. Supp. 2d 200 (S.D.N.Y. 2010) ............................................................................15

*Spagnola v. Chubb Corp.*,
264 F.R.D. 76 (S.D.N.Y. 2010) ......................................................................................25

*Stiles v. HarperCollins Publishers LLC*,
801 F. Supp. 2d 233 (S.D.N.Y. 2011)..............................................................................21

*Tarshis v. Riese Org.*,
211 F.3d 30 (2d Cir. 2000) ..............................................................................................14

*Twentieth Century Fox Film Corp. v. Marvel Enters.*,
155 F. Supp. 2d 1 (S.D.N.Y. 2001),
*aff'd in part*, 227 F.3d 253 (2d Cir. 2002)......................................................................14

*United States v. Bari*,
    599 F.3d 176 (2d Cir. 2010) ........................................................................14

*United States v. O'Neill*,
    No. 15-MJ-2116, 2015 U.S. Dist. LEXIS 102637 (W.D.N.Y. Aug. 5, 2015).......................14

*Walker v. Time Life Films, Inc.*,
    784 F.2d 44 (2d Cir. 1986) .........................................................................11

*Warner Bros. Inc. v. Am. Broad. Cos.*,
    720 F.2d 231 (2d Cir. 1983) .......................................................................16

*Williams v. A&E TV Networks*,
    122 F. Supp. 3d 157 (S.D.N.Y. 2015) ..........................................................3, 11

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996) ...............................................................*passim*

## Statutes

17 U.S.C. § 102(b) ..........................................................................13

## Other Authorities

Fed. R. Evid. 201(b)........................................................................14

Fed. R. Civ. P. 12(b)(6)............................................................... 1, 10, 25

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.10[B][3]
    (2013) ..............................................................................3

Defendants The Cartoon Network, Inc. ("CN, Inc."), Turner Broadcasting System, Inc. ("TBS, Inc."), and Boom Entertainment, Inc. ("Boom"), (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff Michael Richard Kaye's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1]

## PRELIMINARY STATEMENT

Plaintiff alleges that the original animated television series *Steven Universe*, which is aired on Cartoon Network, infringes Plaintiff's copyright in his self-published independent comic book series "Amphoman." However, even a cursory review of those works quickly reveals that there is no possible legally cognizable "substantial similarity" between them, and, thus, Plaintiff's Complaint must be dismissed with prejudice.

The Second Circuit has expressly held that a district court can—and should—dismiss a copyright infringement claim at the pleading stage if, after reviewing the subject works, it determines either that the works are not substantially similar, or that their similarity concerns only non-protectable elements. A simple comparison of the subject works reveals that they are fundamentally dissimilar in matters large and small. On the one hand, *Steven Universe* tells the story of a boy, Steven, who lives in a magical temple in the fictional town of Beach City with a trio of alien guardians known as the Crystal Gems. The series tracks Steven's coming-of-age as he learns about his own magical powers under the tutelage of the Crystal Gems, comes to terms with the legacy of his deceased mother, who passed along her powers to him, and helps the Crystal Gems protect humanity and repel residents of their home planet from invading and

---

[1] Plaintiff incorrectly named The Cartoon Network, Inc. in his complaint as "Cartoon Network, Inc." and Turner Broadcasting System, Inc. as "Turner Broadcast Systems, Inc." None of the other defendants named in this action appear to have been served, and, accordingly, this motion is brought only on behalf of the Defendants. On May 31, 2017, the Court extended Plaintiff's time to effectuate service on the other named defendants to June 30, 2017, and ordered that if those defendants are served in a timely fashion, they may join in the instant motion to dismiss. (Dkt. No. 30, at 1.) In the event those other defendants are timely served, they plan to join in this motion, and the undersigned plans to represent them in connection herewith.

colonizing Earth.  Plaintiff's comic book, by contrast, is about an adult marine biologist named Ulrius Joules who lives in Fort Lauderdale and turns into the amphibious superhero Amphoman upon finding a gemstone from another planet.  The comic follows Amphoman as he searches for and collects gems to prevent his fellow humans from using them for ill.  The works' plotlines, settings, pace, and central themes are vastly different, and their characters share no names, discernible character traits, or superpowers.

The only conceivable similarity between the works is that they both employ the concept of magical gems—however, they do so in vastly different ways.  In *Steven Universe*, the gems are *characters themselves*—living, breathing aliens in anthropomorphic gem form.    In "Amphoman," the gems are *inanimate stones* that entered Earth's atmosphere from space (much like meteorites) and give humans temporary magical powers.  In any event, the mere concept of magical gems is not, itself, protectable—but rather a quintessentially unprotectable idea long in the public domain.

Despite this, Plaintiff attempts to cobble together a list of scattered similarities between the works in Exhibit B to his Complaint.  However, courts have repeatedly warned that such a scattershot approach cannot support a finding of substantial similarity or copyright infringement.  And, even worse, many of Plaintiff's purported "similarities" do not actually exist, and are based on gross misrepresentations or mischaracterizations of the works.  To the extent that Plaintiff does identify any discernable "similarities" in his list, they relate entirely to non-protectable ideas, *scènes à faire* flowing therefrom, and highly generalized plot devices over which—like the concept of magical gems—Plaintiffs can claim no monopoly.  In sum, no amount of discovery or expert testimony can change the fundamental dissimilarity between the two works at issue, and the Complaint should be dismissed now, with prejudice.

2

## STATEMENT OF FACTS

The facts set forth herein are taken from the allegations in the Complaint and from documents incorporated by reference in or integral to the Complaint, including Plaintiff's "Amphoman" comics and episodes of *Steven Universe*.[2]  Plaintiff is the creator of the animated character "Amphoman" and claims to own 31 copyrights in his "Amphoman creation," including in a comic book series in which Amphoman appears.  (Dkt. No. 1 ("Compl.") ¶¶ 1, 16.)  CN, Inc., a wholly owned indirect subsidiary of TBS, Inc., owns and operates the television programming service Cartoon Network, which airs the animated series *Steven Universe*.  (*Id.* ¶ 2.)  Plaintiff claims that the defendants have infringed his copyrights in "Amphoman" by copying various aspects of that work in the *Steven Universe* series.

### A.    Plaintiff's "Amphoman" Comic Book Series

Plaintiff's "Amphoman" comic book series, published between February 2012 and September 2013, spans 9 issues and approximately 120 pages.[3]  The series opens on its protagonist, Dr. Ulrius Joules, a marine biologist from Fort Lauderdale, as he researches a cure

---

[2] On a motion to dismiss a copyright infringement claim based on lack of substantial similarity, the Court may consider documents incorporated in the complaint by reference, as well as documents "integral" to the complaint and relied on in it.  *See Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (hereinafter, "*Gaito*") ("If . . . the district court determines that the two works are not substantially similar as a matter of law, the district court can properly conclude that the plaintiff's complaint, together with the works incorporated therein, do not plausibly give rise to an entitlement to relief.") (citations omitted); *accord, e.g., Hallford v. Fox Entm't Grp., Inc.*, No. 12 Civ. 1806 (WHP), 2013 U.S. Dist. LEXIS 19625, at *5-6 (S.D.N.Y. Feb. 13, 2013); *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642, 655 (S.D.N.Y. 2011).  Accordingly, Plaintiff's "Amphoman" comic books, all episodes of *Steven Universe* referenced in Exhibit B to the Complaint, and several other *Steven Universe* episodes demonstrating key plot points are annexed as exhibits to the accompanying Declaration of Frank D'Angelo ("D'Angelo Decl.").  *See, e.g., Williams v. A&E TV Networks*, 122 F. Supp. 3d 157, 160 (S.D.N.Y. 2015) (considering 13 allegedly infringing episodes of defendants' television series involving over 100 episodes and dismissing copyright infringement claim on the pleadings); *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 12.10[B][3] (2013) (on a motion to dismiss, "the court may render its decision based on representative samples of defendant's episodic work, rather than being required to look at all . . . episodes in reaching its determination of substantial similarity") (citation omitted).

[3] Issue 1 appears to have been initially published in February 2012 and later re-released in September 2013 with a different cover and artwork, as reflected in Exhibits 1 and 2 to the accompanying Declaration of Frank D'Angelo.  Plaintiff refers to these two versions as the "90s book 1" and the "Book1 remake" (Compl. Ex. B.)  Accordingly, although the series is limited to nine issues, it consists of ten separate books.

for his rare form of cancer at V-Tek Laboratory.  (D'Angelo Decl. Ex. 1 [Issue 1], at 1-2.)  After

a fruitless night of research, Dr. Joules retreats to his condominium, outside of which he finds a

marble-size gemstone that appears to have fallen from the sky.  (*Id.* Ex. 1, at 3-5.)  A disturbance

outside shakes the ground, causing Dr. Joules to knock a glass of water onto both him and the

gemstone.  (*Id.* Ex. 1, at 7-9.)  The water, in turn, "activates" the gemstone, which embeds in Dr.

Joules' forehead and transforms him into Amphoman.  (*Id.* Ex. 1, at 9-10.)



As Amphoman, Dr. Joules has frog-like superpowers—a long tongue, the ability to leap

20 yards at a time, and slippery skin enabling him to evade his enemies' grasp.  (*Id.* Ex. 1, at 25-

27; *id.* Ex. 5 [Issue 4], at 5.)  Those powers last only for several hours before Amphoman reverts

to human form as Dr. Joules.  (D'Angelo Decl. Ex. 1 [Issue 1], at 25-28; *id.* Ex. 4 [Issue 3], at 5;

*id.* Ex. 8 [Issue 7], at p. 10 of PDF.)[4]  As the image above demonstrates, the only way for Dr.

Joules to re-activate or sustain his amphibious form is by touching or drinking water—this is his

"Trigger Event."  (*Id.* Ex. 1 [Issue 1], at 25.)

Amphoman's gemstone, he discovers, entered Earth's atmosphere with other gems, each

with its own magical power and Trigger Event.  As recounted in an introduction to each issue:

---

[4] Issues 7 through 9 and the "Book 1 Remake" are not numerically paginated.  Page cites to those issues correspond
to pages of the PDF file submitted as an exhibit (including the "exhibit" page).  (D'Angelo Decl. Exs. 2, 8, 9, 10.)

In a galaxy millions of light years from Earth there was a planet named Guiba. Guiba was ruled by a greedy and devious leader called King Trell. Trell discovered an ancient crystal transforming machine that he secretly kept. The machine would transform any living being into a crystalized Gem. The King used the machine to zap everything he encountered from insects to humans. He then sold the Gems to the unsuspecting townspeople.

One day Planet Guiba was struck by a gigantic meteor and was destroyed. Thousands of Gems were scattered throughout the Universe.

Centuries later these Gems began landing on Earth. These are no ordinary Gems. They encapsulated the souls of living beings. Anyone coming into contact with one of these Gems will fuse with the soul it holds. Once fused, the living being is now vulnerable each time a specific Trigger Event occurs. Once the fused being is exposed to the specific Trigger Event, the Gem takes over the being. For instance, a Gem might activate when exposed to the sun, another Gem might require shadows to activate. A Gem must fuse with a living being on Earth in order to have any power.

(*E.g.*, *Id*. Ex. 1 [Issue 1], p. 4 of PDF; *see also id*. Ex. 7 [Issue 6], at 6-9 (same).) The following images illustrate this:[5]

   

With his new powers, Amphoman sets out to find other gemstones from Planet Guiba and collect them from ill-intentioned humans in Fort Lauderdale. Most issues feature a new villain with whom Amphoman does battle and from whom he retrieves a new magical gemstone:[6]

- *Issue 1: Friend or Pho? & Issue 2: My Dear Brother… Where Are You?* – The villain Black Bull captures Amphoman's brother Keever and transforms him into "Brain Demon" by sawing his head open and implanting him with a red gemstone. Amphoman briefly battles Brain Demon until the latter reverts to human form.

---

[5] These images are taken from Issue 6. (D'Angelo Decl. Ex. 7, at 9.)

[6] Images of villains below are taken from the cover of Issue 1, and from Issue 5. (D'Angelo Decl. Ex. 1, at cover page; *id*. Ex. 6 [Issue 5], at 8; *id*. Ex. 8 [Issue 7], at p. 12 of PDF.)

Upon realizing he has battled his brother, Amphoman takes him to a nearby hospital. (*Id*. Ex. 1 [Issue 1], at 12-22, 26-29; *id*. Ex. 3 [Issue 2], at 1-3.)



- *Issue 3: Thunder from Under* – Amphoman defeats Thunder Guitar, who sets about to wreak havoc with his supersonic guitar. (*Id*. Ex. 3 [Issue 2], at 6-8; *id*. Ex. 4 [Issue 3], at 2-5.)

- *Issue 4: Your Shadow or Mine?* – Amphoman defeats the Black Bull, whose powers are sustained by darkness (his "Trigger Event"). (*Id*. Ex. 5 [Issue 4], at 2-5.)

- *Issue 5: Dogs n' Crabs n' Shadows Oh My!* – Amphoman defeats Shadow Witch, a psychic who takes control of Amphoman's shadow. (*Id*. Ex. 5 [Issue 4], at 7-9; *id*. Ex. 6 [Issue 5], at 2-3.)



- *Issue 6: Enter the Power of the Gems* – Amphoman joins forces with the superhero Bleash, whose superpower is to shoot bullets hotter than the sun, to defeat the villain Crazy Crab, pictured at right. (*Id*. Ex. 6 [Issue 5], at 7-9; *id*. Ex. 7 [Issue 6], at 2-5.)

- *Issue 7: The Unwelcome Spirit* – Bleash reveals that he is a Native American tribal chief. (*Id*. Ex. 8 [Issue 7], at pp. 8-9 of PDF.)



- *Issue 8: It's The Bloody Truth* – Amphoman and Bleash defeat the blood-sucking villain Mosquito Man, pictured below right. (*Id*. Ex. 9 [Issue 8], at pp. 8-12 of PDF.)

Issue 8 also foreshadows the series' discontinuation. Amphoman "breaks the fourth wall" to lament that "not even one person has bought an Amphoman comic," and wonders "why [Plaintiff] Mike [Kaye] doesn't quit." (*Id*. Ex. 9 [Issue 8], at pp. 5-6 of PDF.) The series concludes with *Issue 9: Life Is a Blur*, in which Amphoman resolves to "take a break from this whole superhero schmeel" to "start a family," and determines that "there's more [he] need[s] to get from life besides chasing gems." (*Id*. Ex. 10 [Issue 9], at pp. 5-6 of PDF.) The story abruptly cuts to 15 years in the future, after Dr. Joules has "lost most of [his] money buying gems" and the rest of it "in the mortgage-housing crisis." (*Id*. Ex. 10 [Issue 9], at p. 10 of PDF.) Although the original gemstone remains embedded in his forehead, Dr. Joules appears unable to transform

into Amphoman.  Nonetheless, Dr. Joules is cancer-free and appears to have found a measure of happiness as a husband and father.  (*Id*. Ex. 10 [Issue 9], at pp. 11-12 of PDF.)[7]

   **B.    The *Steven Universe* Animated Television Series**

   *Steven Universe*, which has aired on Cartoon Network since 2013, spans over 120 television episodes and over 20 hours of programming.  The show follows the adventures of its title character, Steven Universe, a half-human, half-alien boy who lives in a magical beachside temple in the fictional town of Beach City with Garnet, Amethyst, and Pearl—a trio of female Gem warriors known as the "Crystal Gems"—as they protect humanity from evil Gems that seek to colonize Earth.  The son of the Crystal Gems' former leader Rose Quartz and human Beach City resident Greg Universe, Steven is born with magical powers, but, at the series' outset, does not know how to use them.  The series tracks Steven's coming-of-age as he learns about his powers under the tutelage of the Crystal Gems—and his place among them.

   For example, one of the series' first episodes[8] follows Steven as he attempts to and succeeds in summoning a magical shield from the pink gemstone in his torso.  (*Id*. Ex. 15 [Ep. 1], at 4:30-8:10.)  Steven seeks the Crystal Gems' guidance in utilizing his powers, and each demonstrates her own powers in turn.  Pearl, the most buttoned-up and overtly motherly Gem,

---

[7] In addition to the "Amphoman" comic series, the Complaint and Exhibit A thereto reference certain "Amphoman" comic strips that Plaintiff claims to have published in the Broward Community College newspaper and several "Amphoman Funnies" comic books (Compl. ¶ 15; Dkt. No. 1-1, at 6-11, 46-48, 53-55), which appear to contain those same comic strips (in addition to other, non-Amphoman content).  (D'Angelo Decl. Exs. 11-13).  Plaintiff, however, does not point to any elements of those comic strips that are allegedly copied in *Steven Universe*—instead citing only to the full "Amphoman" comic book issues.  (Compl. Ex. B.)  Indeed, the very "ideas and elements" that Plaintiff claims are "essential" to his work—that "Universe Gems" "fall from the sky" and "can embed on . . . villains," forcing Amphoman to "hunt[ ] down and defeat[ ]" those villains (Compl. ¶ 19)—appear nowhere in those comic strips or "funnies" books.  Instead, they depict Amphoman in fairly mundane situations—housesitting, paying his dry cleaning bill, visiting the doctor's office, and discussing car payments, among other things.  (D'Angelo Decl. Ex. 11, at p. 27 of PDF; *id*. Ex. 12, at pp. 5-6, 8-9 of PDF; *id*. Ex. 13, at p. 6 of PDF.)  Nonetheless, Defendants submit copies herewith, as they further underscore that Plaintiff's works are vastly different than *Steven Universe* and not remotely similar enough to support a claim for copyright infringement.

[8] Episode numbers referenced herein correspond to the episode numbers employed by Plaintiff in Exhibit B to his Complaint.  To the extent that any episodes submitted as exhibits begin with a "title card" that displays a different episode number, that "title card" number should be disregarded entirely.  (*See* D'Angelo Decl. ¶ 3).

can summon a spear and project holograms from the while pearl in her forehead.  (*Id*. Ex. 15 [Ep. 1], at 5:10-5:40; *see id*. Ex. 25 [Ep. 16] at 2:00-2:30 (hologram power).)  Amethyst, the youthful and rebellious Gem, can summon a magical whip from the gemstone on her chest and shapeshift. (*Id*. Ex. 15 [Ep. 1], 5:40-6:10; *see id.* Ex. 19 [Ep. 6], at 1:40-3:00 (shapeshifting power).) Garnet, the strong, stoic *de facto* leader of the Gems, can summon a pair of gauntlets from the gemstones in her palms and has precognitive "future vision" power.  (*Id*. Ex. 15 [Ep. 1], at 6:10-6:35; *see id.* Ex. 37 [Ep. 39], at 2:40-3:45, 5:00-5:25 (future vision power).)[9]

 

In subsequent episodes, Steven learns to harness and augment his powers, increasing the size and strength of his shield (*id*. Ex. 30 [Ep. 26], at 7:15-7:45; *id*. Ex. 44 [Ep. 48], at 9:30-10:20), learning to engulf himself and others within a protective bubble (*id*. Ex. 38 [Ep. 40], at 9:25-9:45), discovering his ability to heal others (*id*. Ex. 30 [Ep. 26], at 9:00-10:00), and developing shapeshifting powers of his own (*id*. Ex. 19 [Ep. 6], at 2:45-4:00).  Steven and the Crystal Gems use their powers to fend off evil Gems and other magical forces threatening Beach City and its residents.  (*E.g*., *id.* Ex. 15 [Ep. 1], at 8:20-10:50; *id*. Ex. 21 [Ep. 11], at 7:00-11:15; *id*. Ex. 26 [Ep. 17], at 10:50-12:00; *id*. Ex. 30 [Ep. 26], at 4:15-7:50.)

Gradually, a broader story arc unfolds through which the Crystal Gems' origin and purpose on Earth is revealed:  Steven discovers that the Gems are aliens from a distant planet, the

---

[9] The following images are screenshots from Episode 1, during which the Crystal Gems—from left, Garnet, Amethyst, and Pearl—help Steven harness the power of his magical shield.  (D'Angelo Decl. Ex. 15, at 4:42, 7:53.)

Gem Homeworld, and that five thousand years earlier, the Gems invaded Earth, attempting to colonize the planet and destroy humankind. Rose Quartz, however, viewing the invasion as unfair to life on Earth, spearheaded the Rebellion, in which Gems who were sympathetic to humans repelled Homeworld forces and remained on Earth to protect humanity from future Gem Homeworld incursions. (*Id.* Ex. 38 [Ep. 40], at 7:15-8:00; *id.* Ex. 42 [Ep. 45], at 1:30-2:15, 8:45-10:00; *id.* Ex. 44 [Ep. 48], at 4:10-5:45; Ex. 54 [Ep. 74], at 1:20-5:55.)

During the Rebellion, the Crystal Gems formed their alliance. Pearl served as Rose Quartz's loyal assistant and confidant. (*Id.* Ex. 42 [Ep. 45], at 3:30-4:00, 8:45-10:00.) Together they found Garnet, who formed as a "fusion" of two smaller Gems named Ruby and Sapphire, and whom the Homeworld Gems forced out of their Earth colony during the Rebellion. (*Id.* Ex. 54 [Ep. 74], at 1:20-11:20.) Amethyst, meanwhile, was artificially created by the Homeworld at the "Prime Kindergarten," a manufacturing plant for Gem warriors on Earth during the invasion. The Crystal Gems succeeded in shutting down the Kindergarten and found Amethyst in the process. (*Id.* Ex. 38 [Ep. 40], at 5:00-8:00.) Millennia after the Rebellion, Rose Quartz met Greg Universe in Beach City, and an unlikely romance blossomed between them. (*Id.* Ex. 50 [Ep. 54], at 1:20-7:55, 9:45-11:20.) Rose Quartz became pregnant with Steven, but, as she soon realized, she and Steven could not exist simultaneously, and, once Steven was born, she ceased to exist independently—instead becoming "half of" Steven. (*Id.* Ex. 35 [Ep. 35], at 10:00-11:02.) Years later, Steven discovers that Pearl, too, had romantic feelings for Rose and harbors jealousy toward Greg—but Steven facilitates a reconciliation between them. (*Id.* Ex. 55 [Ep. 86], at 5:50-11:30.)

Steven and the Gems come to realize that the Homeworld is mounting a renewed attempt to invade and colonize Earth, and they must stop at nothing to repel the Homeworld, just as Rose

Quartz and the Crystal Gems did millennia earlier.[10]  (*Id*. Ex. 44 [Ep. 48], at 7:30-11:33; *id*. Ex. 45 [Ep. 49], at 3:00-8:50.)  Even as he prepares to protect humanity, the series follows Steven as he builds relationships with human Beach City residents, among them his own father Greg, from whom he learns more about Rose Quartz (*e.g.*, *id*. Ex. 50 [Ep. 54], at 1:20-11:20); his closest friend and crush Connie, whom Steven ropes into his adventures (*e.g.*, *id*. Ex. 20 [Ep. 7], at 8:10-11:00; *id*. Ex. 36 [Ep. 37], at 2:27-11:30); and Lars and Sadie, who operate the town's donut shop (*e.g.*, *id*. Ex. 24 [Ep. 14], at 3:30-5:55; *id*. Ex. 53 [Ep. 69], at 0:50-2:46).  The series kicked off its fifth season in May 2017, and continues to explore these storylines and others.[11]



## ARGUMENT

**I.    PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM FAILS BECAUSE THE WORKS ARE NOT SUBSTANTIALLY SIMILAR AS A MATTER OF LAW**

### A.    Claims of Substantial Similarity Can Be Dismissed at the Pleading Stage

Copyright claims should be dismissed at the pleading stage pursuant to Federal Rule of

---

[10] The aftermath of one such battle, taken from Episode 49, is depicted below.  (D'Angelo Decl. Ex. 45 [Ep. 49], at 11:13.)

[11] Plaintiff also appears to premise his infringement claim upon the publication of "Steven Universe comic books," alleging in conclusory fashion that a division of Boom publishes those books.  (Compl. ¶ 6.)  But Plaintiff alleges nowhere in his Complaint how those comic books purportedly infringe upon his "Amphoman" copyrights, and does not include those comic books in his list of purported similarities between the works at issue.  (*Id*. ¶ 20 & Ex. B).  In any event, Defendants submit copies of those books herewith.  As is clear upon even a cursory review of the Boom comics, they feature the same characters, themes, settings, and concept as the *Steven Universe* television series, and tell stories that emanate from and dovetail with that televised work.  (D'Angelo Decl. Exs. 56-59.)  Accordingly, Plaintiff's claim with respect to those comic books should be dismissed for the same reasons discussed herein.

Civil Procedure 12(b)(6) where, as here, "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work" or "no reasonable jury, properly instructed, could find that the two works are substantially similar." *Gaito*, 602 F.3d at 63 (citation omitted).[12]  In considering such a motion to dismiss, the Court should review and compare the subject works as documents incorporated by reference in and integral to the complaint, and not assume the truth of allegations of similarities between the works.  As the Second Circuit has explained, "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions of the works contained in the pleadings."  *Id*. at 64 (citations omitted); *see Walker v. Time Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986); *DiTocco*, 815 F. Supp. 2d at 666.

When this Court reviews the actual underlying works—as opposed to Plaintiff's self-serving and inaccurate characterizations thereof—there can be no doubt that there is no substantial similarity between *Steven Universe* and "Amphoman" as a matter of law.  Nor would any amount of discovery change this result:  "[w]hen a court is called upon to consider whether the works are substantially similar, no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works."  *Gaito*, 602 F.3d at 64 (citation omitted); *see, e.g., Gal*, 403 F. Supp. 2d at 306 (case "turns upon the question of substantial

---

[12] *See also, e.g., Croak v. Saatchi & Saatchi, N. Am., Inc*., 174 F. Supp. 3d 829, 831 (S.D.N.Y. 2016) (granting motion to dismiss in copyright action involving sculpture and television commercial); *Lane v. Knowles-Carter*, No. 14 Civ. 6798 (PAE), 2015 U.S. Dist. LEXIS 143794, at *1 (S.D.N.Y. Oct. 21, 2015) (granting motion to dismiss in copyright action involving musical recordings); *Williams*, 122 F. Supp. 3d at 159 (granting motion to dismiss in copyright action involving television series and reality show treatment); *Hallford*, 2013 U.S. Dist. LEXIS 19625, at *1 (granting motion to dismiss in copyright action involving television series and screenplay); *DiTocco v. Riordan*, 815 F. Supp. 2d 655, 666 (S.D.N.Y. 2011) (granting motion to dismiss in copyright action involving film and novels), *aff'd*, 496 F. App'x 126 (2d Cir. 2012); *Canal+ Image UK v. Lutvak*, 773 F. Supp. 2d 419, 427 (S.D.N.Y. 2011) (granting motion to dismiss in copyright action involving film and musical adaptation); *Allen*, 739 F. Supp. 2d at 655 (granting motion to dismiss in copyright action involving literary works); *Alexander v. Murdoch*, No. 10 Civ. 5613 (PAC) (JCF), 2011 U.S. Dist. LEXIS 79503, at *4-7 (S.D.N.Y. July 14, 2011) (granting motion to dismiss in copyright action involving script and television series), *aff'd*, 502 F. App'x 107 (2d Cir. 2012); *Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 297 (S.D.N.Y. 2005) (granting motion to dismiss in copyright action involving screenplay and novel).

similarity between two written works, and the requisite comparison between them would not be enhanced in any manner by discovery"); *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 283-84 (S.D.N.Y. 2005) (pre-discovery dismissal appropriate because "the Court must resolve the copyright infringement question . . . solely by comparing Plaintiff's screenplay and Defendants' finished movie."). Accordingly, the Complaint should be dismissed now, with prejudice.

**B.    Alleged "Similarities" Involving Unprotectable Elements of the Works Are Insufficient to Survive a Motion to Dismiss**

To establish a claim of copyright infringement, two elements must be proven: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). With respect to the second element, even if a plaintiff can establish "actual copying," that is not sufficient to impose liability—a plaintiff must demonstrate that the copying is *illegal* "because a substantial similarity exists between the defendant's work and the *protectable elements* of plaintiff's." *Gaito*, 602 F.3d at 63 (emphasis added; citation omitted).[13]

Under the "ordinary observer" test for substantial similarity, courts ask if an "average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Id.* at 66 (citation omitted). Where, as here, the plaintiff's work contains both protectable and unprotectable elements, courts apply what is known as the "more discerning" ordinary observer test, and must "attempt to extract the unprotectible elements" from its consideration, *id.* (quoting *Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995)),

---

[13] On a motion to dismiss a copyright infringement claim, courts often assume that the required element of "actual copying" has occurred and address only whether the requisite "substantial similarity" between protectable elements exists. *See, e.g., Gaito*, 602 F.3d at 63; *DiTocco*, 815 F. Supp. 2d at 665. Because this motion is based solely on substantial similarity, it does not address whether Defendants had "access" to Plaintiff's work. In any event, Plaintiff claims that he "sent his Amphoman work to Defendants" as detailed in paragraph 18 of his Complaint. (Compl. ¶ 18.) Should this case move forward, Defendants intend to show that these alleged communications were not accessed by *Steven Universe*'s creative team, and that series creator Rebecca Sugar independently conceived of the idea for her show long before June 2012, first contracted to develop the show in 2011, and released the pilot episode with CN, Inc. in May 2013.

"tak[ing] care to inquire only whether the *protectible elements, standing alone*, are substantially similar." *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996) (emphasis in original; citations omitted). Courts must "analyze the . . . works closely to figure out in what respects, if any, they are similar, and then determine whether . . . the similarity is to something in the original that is free for the taking." *Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250, 2007 U.S. Dist. LEXIS 88960, at *4 (S.D.N.Y. Dec. 3, 2007), *aff'd*, 331 F. App'x 821 (2d Cir. 2009) (internal quotation marks omitted); *see Gaito*, 602 F.3d at 67.

Among those unprotectable elements "free for the taking" are ideas, *scènes à faire*, and public domain elements. It is a "principle fundamental to copyright law" that a copyright does not protect an idea—only its expression. *Williams*, 84 F.3d at 587 (citation omitted); *see* 17 U.S.C. § 102(b). Thus, "it has been emphasized repeatedly that the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90-91 (2d Cir. 1976). Similarly, the doctrine of *scènes à faire* "holds that sequences of events necessarily resulting from the choice of setting or situation, or incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic are not protectible under the copyright laws." *Kaplan v. Stock Mkt. Photo Agency, Inc.*, 133 F. Supp. 2d 317, 322-23 (S.D.N.Y. 2001) (citations omitted); *see id.* at 325 (holding that similar business attire in two photographs are *scènes à faire*, as they "might reasonably be expected to appear in any expression of the unprotectible idea" of a businessperson contemplating a leap from a city building).

While the Complaint attaches an exhibit listing purported "similarities" between the two works (Compl. Ex. B)—all of which are false or irrelevant, as explained *infra* at 23-25—

Plaintiff's claim is, at heart, nothing more than that *Steven Universe* and "Amphoman" both employ the concept of magical gems. (*Id.*; *see* Compl. ¶ 19.) But, the concept of "magical gems" is a quintessentially unprotectable idea, and one as to which Plaintiff holds no exclusive monopoly. *See Williams*, 84 F.3d at 587. From religious and cultural mythology to elements of creative works prominent in the fantasy genre—such as Marvel Comics' infinity gems and Zelda video games' spiritual stones—popular culture is filled with stories of magical gemstones bestowing their bearers with powers both good and evil.[14]

In any event, a review of the subject works shows that they employ the concept of magical gems in vastly different ways. First, and most fundamentally, in *Steven Universe*, the Gems are the *characters themselves*—living, breathing aliens from the Gem Homeworld who originally traveled to Earth to colonize it—whereas in "Amphoman" the gemstones are *inanimate objects* that floated to Earth from the Planet Guiba. (*Supra* at 4-5, 7-8.) Although both have magical powers, this too is expressed in distinct ways. The Gems in *Steven Universe* have *permanent* magical powers that they may wield by their own volition. This is true for Steven as well—who, although initially unfamiliar with his powers, learns to harness and master them. By contrast, the gems from Planet Guiba require a "Trigger Event" to activate and, even

---

[14] *See, e.g.*, Bruce G. Knuth, *Gems in Myth Legend & Lore* (rev. ed. 2007); Claude Lecouteux, *A Lapidary of Sacred Stones: Their Magical & Medicinal Powers Based on Earliest Sources* (Jon E. Graham trans., Inner Traditions ed. 2012) (2011); *Infinity Gems*, Wikipedia.org, https://en.wikipedia.org/wiki/Infinity_Gems (last visited June 19, 2017); *Spiritual Stones*, Zeldapedia, http://zelda.wikia.com/wiki/Spiritual_Stones (last visited June 19, 2017). The Court may properly take judicial notice of this. *See* Fed. R. Evid. 201(b) (judicial notice appropriate if facts are "not subject to reasonable dispute" and "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Tarshis v. Riese Org.*, 211 F.3d 30, 39 (2d Cir. 2000) (on a motion to dismiss, courts may also consider materials "of which judicial notice may be taken"); *see also, e.g., Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 546-47 (S.D.N.Y. 2007) (taking judicial notice of novels written by third parties to determine stock elements of the mystery/thriller genre as part of similarity analysis); *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 155 F. Supp. 2d 1, 41 & n.71 (S.D.N.Y. 2001) (taking judicial notice of storyline in Star Wars film on motion to dismiss), *aff'd in part*, 227 F.3d 253 (2d Cir. 2002); *United States v. O'Neill*, No. 15-MJ-2116, 2015 U.S. Dist. LEXIS 102637, at *4 n.3 (W.D.N.Y. Aug. 5, 2015) (taking judicial notice of facts in Wikipedia entry). Indeed, a basic Internet search shows that there are numerous fiction and non-fiction literary works discussing the cultural significance of magical gemstones. *See United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (per curiam) (affirming judicial notice of Internet materials and explaining that "a judge need only take a few moments to confirm his intuition by conducting a basic Internet search").

then, bestow Dr. Joules and other "Amphoman" characters with only *temporary* powers.  (*Supra* at 4-5, 7-8.)  Notably, *none* of the Crystal Gems' powers in *Steven Universe* are the same as those bestowed by the gems from Planet Guiba in "Amphoman."  (*Supra* at 4-8.)  Finally, although characters in both works have physical gemstones located on their bodies, Gems in *Steven Universe* are born with those stones and have them on different parts of their bodies; whereas gems in "Amphoman" fuse exclusively to humans' foreheads, and do so only once they are found and activated.  (*Supra* at 4-5, 7-8.)

Courts in this Circuit have *repeatedly* dismissed infringement claims based on far greater similarities in ideas, and *scènes à faire* resulting therefrom.  *See, e.g., Williams*, 84 F.3d at 589 (no copyright protection for concept of adventure story featuring modern-day children visiting park of ancient dinosaurs, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers); *DiTocco*, 815 F. Supp. 2d at 672-73 (no protectable similarity between two adventure stories featuring shared idea of modern-day adolescent male named Percy, descended from Greek gods, featuring characters from Greek mythology and shared plot point of Zeus's missing lightning bolt); *Sheldon Abend Revocable Trust v. Spielberg*, 748 F. Supp. 2d 200, 208 (S.D.N.Y. 2010) (holding "voyeur-suspicion-peril-vindication" premise of *Rear Window* was unprotectable); *Porto v. Guirgis*, 659 F. Supp. 2d 597, 611 (S.D.N.Y. 2009) (holding idea of a modern fictional account of "Judas standing trial," with historical figures as witnesses, was unprotectable); *Mallery*, 2007 U.S. Dist. LEXIS 88960, at *18-19 (no protectable similarity when works shared ideas of a character "painting a future in which tragic and destructive events take place," "having a prediction confirmed by a newspaper report," and "making an attempt to prevent a tragic event in light of a prediction of the future");  *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 300, 310 (S.D.N.Y. 1999) (no protectable similarity between two works featuring half-

human, half-vampire protagonist named Nicholas Gaunt, who seeks to uncover truth of his origin through flashback memories, is faced with choice between good and evil, is indoctrinated into forces of evil by killing, and has a romance, because "[m]ost of these similarities . . . are unprotectible ideas"); *see also, e.g., Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010) (no substantial similarity between two works, each titled *The Last Samurai*, "shar[ing] the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising"). Similarly, here, any similarity in the works' underlying ideas does not give rise to an infringement claim.

### C. There is No Substantial Similarity Between the Protectable Elements of "Amphoman" and *Steven Universe* as a Matter of Law

In assessing substantial similarity, courts must examine the works as a whole and consider such aspects as their "total concept and feel, theme, characters, plot, sequence, pace, and setting." *See, e.g., Williams*, 84 F.3d at 588. Dismissal is appropriate where the purported similarities concern non-copyrightable elements of the plaintiff's work. *See Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983); *Gal*, 518 F. Supp. 2d at 542; *Green v. Lindsey*, 885 F. Supp. 469, 488 (S.D.N.Y. 1992), *aff'd*, 9 F.3d 1537 (2d Cir. 1993). Here, when viewed as a whole, "Amphoman" and *Steven Universe* are not even close to being substantially similar as a matter of law. Any tangential similarities relate only to their unprotectable elements.

#### 1. The Plots and Sequences of Events Are Fundamentally Different

There is no similarity in plot or sequence of events. The characters' origin stories are completely different: the explosion of Planet Guiba and dissemination of King Trell's gemstones throughout Earth, followed by Dr. Joules' discovery of one such gemstone outside his condo, does not even remotely resemble the storyline of Steven's birth as the son of Gem Rebellion

leader Rose Quartz and human Greg Universe.  (*Supra at* 4-5, 8-9.)  Nor are there any similarities between the ways those stories unfold after their protagonists' origins.  "Amphoman" proceeds as a fairly straightforward "monster-of-the-week" series, in which Amphoman battles one villain after another until he finally calls it quits as a superhero.  In sharp contrast, *Steven Universe* weaves together multiple story arcs in which Steven learns to master his powers, comes to terms with the death and legacy of his mother, and helps the Crystal Gems repel another attempt by the Gem Homeworld to invade and colonize Earth.  And, unlike Amphoman, Steven does not ultimately reject his superhero life; he embraces it and becomes a more integral member of the Crystal Gems.  (*Supra at* 5-6, 8-10.)

## 2. There Is No Protectable Similarity Between the Works' Characters

"To determine whether characters are similar . . . courts look at the totality of the characters' attributes and traits as well as the extent to which the defendants' characters capture the total concept and feel of figures in the plaintiffs' work."  *DiTocco*, 815 F. Supp. 2d at 667 (alteration and citation omitted).  "The bar for substantial similarity in a character is set quite high."  *Id.* (citation omitted).  Here, there is none.

The characters in the works share no names, discernible character traits, superpowers, or weapons of choice.  (*Supra* at 4-8, 10.)  Steven is a child.  He is optimistic, enthusiastic, and emphatic.  For example, upon discovering that the Crystal Gems are thousands of years old, he decides to throw them birthday parties to make up for the thousands of birthdays they have missed through the millennia.  (D'Angelo Decl. Ex. 23 [Ep. 13], at 1:45-5:15.)  He puts himself in harm's way because he thinks it will protect the Crystal Gems.  (*Id.* Ex. 44 [Ep. 48], at 5:45-10:20.)  He facilitates Pearl and Greg's reconciliation after their jealously over Rose Quartz tore them apart. (*Id.* Ex. 55 [Ep. 86], at 8:10-11:20.)  By contrast, Dr. Joules/Amphoman is an adult marine biologist.  He is troubled and down-on-his-luck.  He shops at the dollar store, and laments

the cost of living in his hometown and his lack of health insurance.  (*Id.* Ex. 2 [Book 1 Remake], at pp. 9-11 of PDF; *id.* Ex. 9 [Issue 8], at pp. 5-7 of PDF; *id.* Ex. 10 [Issue 9], at p. 5 of PDF.) The purpose of his research is to cure his own cancer.  (*Id.* Ex. 1 [Issue 1], at 1-2.)

The supporting casts of characters likewise differ markedly.  Steven's parents feature predominantly in the *Steven Universe* storylines, while Dr. Joules' parents are absent from "Amphoman."  (*Supra* at 3-10.)   In *Steven Universe*, the Crystal Gems with whom Steven lives are complicated and layered female characters, each with their own distinct personalities.  (*Supra* at 7-8.)   On the other hand, in "Amphoman," supporting characters are predominantly male (*supra* at 5-6), and the only featured female character is defined exclusively by her superpower—not by any discernable personality traits.  (*See* D'Angelo Decl. Exs. 5-6.)

The only conceivable overlap is that characters in each work have superpowers and team up to fight opposing forces—but such features are simply *scènes à faire* common to any superhero genre work and are, of course, not protectable.  *See, e.g.*, *DiTocco*, 815 F. Supp. 2d at 668-69 (elements such as "a questing hero acting in accord with a divine power or powers" or "[y]oung male heroes who must cope with missing parents and display their strength in battles with otherworldly forces are commonplace" and unprotectable) (citation omitted); *Lewinson v. Henry Holt & Co., LLC*, 659 F. Supp. 2d 547, 567 (S.D.N.Y. 2009) ("scenes that depict the superhero performing feats of miraculous strength, wearing a tight-fitting acrobatic costume, battling wealthy megalomaniacal villains, exercising the power of self-propelled flight, or leading a double life are all unprotectable scenes a faire" to superhero works) (alterations and citation omitted).

### 3.    The Works Have Vastly Different Themes

The two works differ vastly in message and theme.  *Steven Universe* is, in large measure, the story discovering who he is and where he came from.  Among its central themes are inclusion

and diversity.  Steven is not a stereotypically masculine character.  For example, he performs at a local music festival in a crop top, high heels, and makeup, and townspeople do not bat an eye (D'Angelo Decl. Ex. 53 [Ep. 69], at 10:30-11:15); and he occasionally "fuses" with his human female friend Connie and transforms into the confident androgynous character "Stevonnie" (*Id*. Ex. 36 [Ep. 37], at 2:27-11:30).  The series features an overtly romantic relationship between the female Gems Ruby and Sapphire, who "fuse" to become Garnet.  (*Id*. Ex. 45 [Ep. 49], at 4:40-5:20.)  Expelled from the Homeworld Gem colony after fusing, Garnet ultimately finds acceptance among the Crystal Gems.  (*Id*. Ex. 54 [Ep. 74], at 4:20-11:20.)  Similarly, Pearl has romantic feelings for Rose Quartz and, after being rejected by Rose in favor of Greg, takes solace in caring for Steven as if he were her own son.  (*Id*. Ex. 55 [Ep. 86], at 5:50-8:10.)

"Amphoman" shares none of these themes.  As its characters are all adults, there is no coming-of-age storyline.  There are no equivalent themes of inclusion and diversity.  For example, Amphoman uses the derogatory Yiddish term "fagala."  (*Id*. Ex. 2 [Book 1 Remake], at p. 18 of PDF.)  When Bleash is in close physical proximity to him, Amphoman warns, "Just don't kiss me—I will shoot mind you."  (*Id*. Ex. 7 [Issue 6], at 6.)  As noted above, the series features virtually no female characters.  And, although occasionally teaming with Bleash, Amphoman is often isolated from others:  as Dr. Joules, he conducts research in solitude, and after rescuing his brother from Black Bull in Issue 2 the brothers never reunite.  (*Id*. Ex. 1 [Issue 1], at 1-3; *id*. Ex. 3 [Issue 2], at 3-5.)  To the extent there are overlapping themes arising from the works' superhero subjects, they are similar only at the highest level of abstraction and not in any legally cognizable way.  *See, e.g.*, *Williams*, 84 F.3d at 589 ("Any similarity in the theme of the parties' works relates to the unprotectible idea of a dinosaur zoo. Once one goes beyond this level of abstraction, the similarity in themes disappears."); *Porto*, 659 F. Supp. 2d at 612, 615

(works based on same idea of "trial of Judas" had different themes).

### 4.    The Settings and Pace of the Two Works Are Plainly Different

The main characters in *Steven Universe* live in a magical temple home in the fictional town of Beach City.  The show follows them to a host of other magical locations (*e.g.*, D'Angelo Decl. Ex. 17 [Ep. 3], at 4:00-11:30; *id.* Ex. 27 [Ep. 19], at 5:05-7:15; *id.* Ex. 35 [Ep. 35], at 7:00-8:25; *id.* Ex. 45 [Ep. 49], at 0:50-8:50), and frequently employs flashbacks to fill in their backstories, such as how Rose Quartz met Greg and how Garnet formed from Ruby and Sapphire (*id.* Ex. 50 [Ep. 54], at 1:20-11:20; *id.* Ex. 54 [Ep. 74], at 1:00-11:20).  Although featuring cohesive long-term story arcs, the show is primarily episodic.  By contrast, "Amphoman" is set almost exclusively in the real-life town of Fort Lauderdale and unfolds primarily in mono-plot, serial fashion, with most issues picking up at the moment the prior issue concluded.  (*E.g.*, *id.* Ex. 3 [Issue 2], at 2; *id.* Ex. 4 [Issue 3], at 2; *id.* Ex. 5 [Issue 4], at 2; *id.* Ex. 6 [Issue 5], at 2.)

### 5.    The "Total Concept and Feel" of the Works Are Wholly Dissimilar

Finally, the "total concept and feel" of the works are distinct.  Over its more than 120 episodes, *Steven Universe* balances a playful tone, which mirrors its protagonist's childlike optimism, against dramatic long-term story arcs exploring love, loss, and hope.  With subtlety, it conveys coming-of-age lessons, such as rising above the circumstances of one's upbringing (*id.* Ex. 38 [Ep. 40], at 7:15-11:20), stepping outside the protective cocoon of one's parents (*id.* Ex. 52 [Ep. 68], at 8:30-11:30), and accepting oneself when society does not (*id.* Ex. 54 [Ep. 74], at 4:20-11:20).  "Amphoman," by contrast, is more straightforward: with the exception of the alternate first issues, the books are 8 to 9 pages in length, and, in their limited space, they appear targeted at entertaining, not teaching (much less conveying coming-of-age lessons).  And, unlike *Steven Universe*'s predominantly optimistic tone, the tone of "Amphoman" is more cynical: characters live in "not the safest area," populated by "crabby drivers and short fused people," (*id.*

Ex. 2 [Book 1 Remake], at p. 19 of PDF; *id.* Ex. 8 [Issue 7], at p. 6 of PDF), and Amphoman

laments both his own financial plight and that of his creator (*i.e.*, Plaintiff). (*Id.* Ex. 9 [Issue 8],

at pp. 5-7 of PDF; *id.* Ex. 10 [Issue 9], at pp. 4 & 9 of PDF.) *See, e.g.*, *Allen*, 739 F. Supp. 2d at

656-58 (illustrated books differed in "total concept and feel" because, *inter alia*, in one work,

"characters never face any difficult choices, or experience any type of conflict" and "[t]heir

feelings are not addressed and their interpersonal relationships are not explored," whereas in the

other work, "one scene builds upon and transitions to another" and "[t]he storyline is highly

developed and complex"); *Lewinson*, 659 F. Supp. 2d at 576-77 (works were not substantially

similar in total concept and feel where one work was "considerably more nuanced" and

"descriptive," while the other was "more direct[ ]" and "instructional" in tone).

Just as the works' stories differ in detail and depth of treatment, so too do their visual and

aesthetic elements. Even the most cursory review reveals that the *Steven Universe* characters—

and the worlds they inhabit—are more richly detailed than those in the "Amphoman" comics.

*See, e.g.*, *Stiles v. HarperCollins Publishers LLC*, 801 F. Supp. 2d 233, 242 (S.D.N.Y. 2011)

(holding illustrations lacked substantial similarity where "the overall feel varies, namely in that

plaintiffs' illustrations—with leaves and children and action scenes—are much more animated

than defendants', which come across as more utilitarian").

Any arguable similarity in total concept and feel is simply owed to the fact that

"Amphoman" and *Steven Universe* are both superhero stories that incorporate, in vastly different

ways, the unprotectable idea of magical gems. But, courts are mindful that "accepting an overly

broad scope for protectable total concept and feel threatens the basic principle of copyright law:

that concepts and ideas may not be copyrighted, and that only a particular expression of an idea

may be copyrighted." *Lewinson*, 659 F. Supp. 2d at 576 (alteration and citation omitted).

Accordingly, a court conducting a substantial similarity analysis should engage in "a careful assessment of the total concept and feel of the works at issue, *after the non-protectible elements have been eliminated from consideration*." *Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 274 (S.D.N.Y. 2005) (emphasis added; citation omitted); *see DiTocco*, 815 F. Supp. 2d at 671 (works had different overall concept and feel despite both being "young-adult fantasy adventure stories rest[ing] on a similar premise—that Greek mythology is real and young modern-day protagonists must fight mythological battles in order to save the world"). Even *without* extracting unprotectable elements, the total concept and feel of both works are nothing alike. With unprotectable ideas disregarded, this is not remotely a close call.

> **D.    Plaintiff's List of False "Similarities" in Exhibit B to the Complaint Fail in Both Legal Approach and Factual Execution**

Exhibit B to the Complaint contains sixty purported "similarities" between "Amphoman" and select episodes of *Steven Universe*. Without exception, this list either mischaracterizes the subject works—often asserting outright falsehoods (including the repeated claim that both works involve "Universe Gems")—or else involve unprotectable ideas and *scènes à faire*. Plaintiff's apparent hope is that the Court will look at the length of this list and assume that a question of fact must exist, rather than review the subject works and see the differences for itself. This stratagem fails for at least three reasons:

<u>First</u>, courts have repeatedly observed that such "scattershot" lists of random similarities cannot support a claim of copyright infringement, as such lists are "inherently subjective and unreliable" and fail to address the underlying issue of whether the works, as a whole, are substantially similar. *See Williams*, 84 F.3d at 590 (citation omitted) (collecting cases); *see, e.g.*, *Allen*, 739 F. Supp. 2d at 663 ("random similarities scattered throughout the works" are irrelevant when works as a whole are not substantially similar) (citation omitted); *Mallery*, 2007

U.S. Dist. LEXIS 88960, at *22-23 ("'scattershot' listing" of "highly generalized similarities" insufficient to state a claim).

_Second_, as explained _supra_ at 11, the Second Circuit has warned that a Court should _not_ accept a plaintiff's descriptions of the works as true, but rather should review the works for itself to determine whether substantial similarity truly exists.  Upon conducting a review of the episodes cited in the Complaint, most of the purported "similarities" evaporate.[15]  For example:

- Plaintiff claims several times that the gems in both works "embed" on or "fuse" to characters, giving them powers.  (Compl. Ex. B, #1, #9.)  But, as explained _supra_ at 7-8, this is simply not true in _Steven Universe_.

- Plaintiff claims that gems come in different shapes in both works (Compl. Ex. B, #2), but, to the contrary, the gems on the foreheads of "Amphoman" characters appear as identically-shaped circular dots.  (D'Angelo Decl. Ex. 1 [Issue 1], cover page; _id._ Ex. 2 [Book 1 Remake], cover page.)

- Plaintiff initially claims that gems in both works "remain on body whether activated or not" (Compl. Ex. B, #3), but then directly contradicts himself, claiming they "can be removed from the body" and "pop off" (_id._ Ex. B, #12, #19). In any event, in _Steven Universe_, gemstones do not, in fact, "pop off" Gem characters; instead, those characters retreat entirely into their physical gemstones when wounded or defeated.  (_E.g._, D'Angelo Decl. Ex. 20 [Ep. 7], at 10:15-11:15; _id._ Ex. 25 [Ep. 16], at 4:00-5:20.)

- Plaintiff repeatedly claims that characters in both works have powers that are "activated" or "affected" by external trigger events, or that are only "temporary" in nature.  (Compl. Ex. B, #4, #5, #6, #7, #8, #15, #17, #18, #29, #30, #33, #36, #37.)  But, as explained _supra_ at 7-8, Gems in _Steven Universe_ are born with _permanent_ powers that do _not_ require a trigger event to activate.  _Steven Universe_ characters only "activate" their powers insofar as they _choose to use them volitionally_, and Plaintiff cannot possibly claim that a character's mere use of its superpower is a protectable similarity.

- Plaintiff incorrectly claims that both works involve "time travel."  (Compl. Ex. B, #11.)  But, the referenced issue of "Amphoman" does not—it features only a flashback. (D'Angelo Decl. Ex. 7 [Issue 6], at 6-9.)

- Plaintiff claims that gems in both works "can cause the ground to crumble."  (Compl. Ex. B, #26.)  But in the referenced episode of _Steven Universe_, a stuffed animal—not a Gem—causes the ground to crumble.  (D'Angelo Decl. Ex. 17 [Ep. 3], at 9:00-10:40.)

---

[15] The episode timestamps included in Exhibit B to the Complaint do not appear to correspond precisely to the episodes submitted as exhibits herewith.

- Plaintiff vaguely states that, in both works, "Universe gems can combine with other universe gems." (Compl. Ex. B, #31.) While in *Steven Universe*, multiple Gems can "fuse" into an entirely new beings, nothing like this happens in "Amphoman." In Plaintiff's work, characters merely team up to fight evil (D'Angelo Decl. Ex. 7 [Issue 6], at 3-5)—yet another unprotectable stock element of superhero fiction.

- Plaintiff nonsensically claims that in both works, "gem creates red eyed demonic." (Compl. Ex. B, #34.) Although there is a demon in "Amphoman" (Brain Demon), there is none in the referenced episode of *Steven Universe*—only a holographic reproduction of the Pearl character. (D'Angelo Decl. Ex. 25 [Ep. 16], at 2:00-2:30, 9:00-10:45.)

- Plaintiff falsely claims that both works feature a character with a "third eye"— apparently referring to Garnet in *Steven Universe*, and Shadow Witch in "Amphoman." (Compl. Ex. B, #47.) But while the former *actually* has a third eye on her forehead, the latter does not: Shadow Witch has only two eyes and gemstone embedded in her forehead. (D'Angelo Decl. Ex. 21 [Ep. 11], at 8:50-11:00; *id.* Ex. 5 [Issue 4], at 1, 7, 9.)

- Plaintiff mischaracterizes *Steven Universe* as copying the Planet Guiba/King Trell backstory in "Amphoman," discussed *supra* at 5. For example, he claims that both works involve gems that "contain[ ] the soul of a once living being who is now trapped inside," were "created using an ancient crystal transforming machine," and have "traveled light years to get to Earth." (Compl. Ex. B, #13, #40, #48.) But no plotline in *Steven Universe* even remotely resembles the Planet Guiba/King Trell backstory, as the *Steven Universe* episodes to which Plaintiff himself cites clearly demonstrate. (*Id.*)

Third, the other purported similarities that Plaintiff lists are mere unprotectable ideas or *scènes à faire* common to the superhero and fantasy genres (among others), and therefore are irrelevant to a substantial similarity analysis. For example, Plaintiff cannot claim protection for superhero storylines featuring "violence"; the use of powers that "influence" "other beings"; characters that "are unusual to society and have superhuman powers"; characters that "sense danger"; "evil spirit" characters; "mutant" characters; characters with "the ability of flying" or that are "bird themed"; characters that "produce electric lightning"; characters that can "duplicate"; characters that "help keep society safe" and "have good intentions"; characters that are "good or evil depending on how" they act"; or characters that "discuss new villains[,] trying to determine what they may encounter." (Compl. Ex. B, #14, #16, #21, #24, #25, #43, #44, #49, #50–53, #55, #57.) *See DiTocco*, 815 F. Supp. 2d at 668-69; *Lewinson*, 659 F. Supp. 2d at 567.

Similarly, other purported similarities constitute mere generalized abstractions and plot devices that, if protectable, would effectively give Plaintiff a monopoly over large swaths of fiction altogether. (*E.g.*, Compl. Ex. B, #10 (gems "can be anywhere on Earth"), #38 (the works "introduce alternate environments"), #41 (gems are "intriguing enough that certain people want to experiment with them"), #42 (both works use phrase "The power of the gem"), #46 (gems have "unique properties and unknown, mysterious powers"), #54 (format lends itself to "endless" "story possibilities"), #59 ("sample" plot where "villain" is "defeat[ed]"), and #60 (each work involves a "Power of Gems" plot).) That such plot devices can be deprived of context and made to sound similar at the broadest level of generality does not render them infringing. *See, e.g.*, *Alexander*, 2011 U.S. Dist. LEXIS 79503, at *11-13 (rejecting "similarities" alleged "at an overly-abstract level of generality") (citation omitted); *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072-73 (2d Cir. 1992) (mere phrases do not warrant copyright protection).[16]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiff's Complaint be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6).[17]

---

[16] Space limitations prevent Defendants from addressing in detail each and every mischaracterization in Exhibit B to—but, ultimately, this is not necessary. As documents incorporated by reference in and integral to the Complaint, "the works themselves supersede and control contrary descriptions of them . . . contained in the pleadings." *Gaito*, 602 F.3d at 64 (citations omitted). The Court need only review "*Amphoman*" and *Steven Universe* to see that there is no substantial similarity between them as a matter of law. Plaintiff cannot survive a motion to dismiss by mischaracterizing—and at times outright fabricating—the contents of such works, nor by "drumming up . . . technical similarities (as opposed to disparities) that an ordinary observer would be disposed to overlook." *Croak*, 174 F. Supp. 3d at 838. Nonetheless, Defendants would be happy to furnish the Court with a chart showing the defects in all of Plaintiff's alleged similarities upon request.

[17] Even if the Court determines that there is a question of fact concerning whether the works are substantially similar, Plaintiff's claims against TBS, Inc. should be dismissed because the Complaint is devoid of any allegations against it other than to assert that TBS, Inc. is the parent of CN, Inc. This does not suffice to state a claim, as a matter of law. *See Child v. Beame*, 417 F. Supp. 1023, 1025-26 (S.D.N.Y. 1976) ("When a defendant is merely named in the caption of a complaint but is nowhere claimed to have caused the plaintiff injury, the complaint against him must be dismissed.") (citing *Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974)); s*ee also Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 86, 89 (S.D.N.Y. 2010) (courts frequently dismiss claims against parent companies where complaint does not allege facts sufficient to establish alter-ego liability).

Dated: New York, New York
      June 21, 2017

LOEB & LOEB LLP

By: _/s/ Christian D. Carbone_
    Christian D. Carbone (CC-6502)
    Frank D. D'Angelo (FD-0911)
    345 Park Avenue
    New York, New York 10154-1895
    212-407-4000

*Counsel for Defendants The Cartoon Network, Inc., Turner Broadcasting System, Inc., and Boom Entertainment, Inc.*

13533534.1